UNITED STATES of America, Plaintiff,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WARE-HOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.

In re APPLICATION LXVI OF THE INDEPENDENT ADMINISTRATOR.

No. 88 CIV. 4486 (DNE).

United States District Court,
S.D. New York.

Jan. 17, 1992.

See also 782 F.Supp. 238.

Otto Obermaier, U.S. Atty., S.D.N.Y. (Edward T. Ferguson, III, Asst. U.S. Atty., of counsel), for U.S.

Frederick B. Lacey, Independent Adm'r of the Intern. Broth. of Teamsters.

Vincent C. Beck and James P. Hoffa, pro se and for IBT Local 707.

## OPINION AND ORDER

EDELSTEIN, District Judge:

This opinion emanates from the voluntary settlement in the action commenced by the plaintiffs United States of America (the "Government") against the defendants International Brotherhood of Teamsters (the "IBT") and the IBT's General Executive Board (the "GEB") embodied in the voluntary consent order entered March 14, 1989 (the "Consent Decree"). The Consent Decree provided for three Court-appointed officials, the Independent Administrator to oversee the remedial provisions, the Investigations Officer to bring charges against corrupt IBT members, and the Election Officer to oversee the electoral process leading up to and including the 1991 election for International Officers (collectively, the "Court Officers"). The goal of the Consent Decree is to rid the IBT of the hideous influence of organized crime through the election and prosecution provisions.

This matter arises out of the refusal by the seven incumbent officers of Local 707 [1] to relinquish control of the Local Union to the newly elected officers voted into office by the Local Union membership in a court ordered rerun election. The incumbent officers refusal to relinquish control violates the IBT Constitution, the wishes of the Local Union membership as expressed in their vote, and the direction of the IBT General President. Given the urgency of this matter, the incumbent members of IBT

Local 707 and their counsel were given until 12:00 noon on January 16, 1992 to file papers. The Government and the Local 707 Pride Coalition (the "Pride Coalition") were given until the close of business January 16, 1992 to submit reply papers.

## I. BACKGROUND [2]

### A. Knowing Association With A Member of La Cosa Nostra

This matter stems from the Independent Administrator's November 18, 1991 decision in Application LX, in which he found that the Investigations Officer had proved charges that three former officers of Local 707, James Buckley, Dominick Milano and David Morris, among others, knowingly associated with a member of La Cosa Nostra, Nicholas Grancio.[3] As a penalty, the Independent Administrator permanently banned these three men from the IBT. While the Independent Administrator often stays the imposition of penalties pending review by this Court, the Independent Administrator did not do so in this case because Buckley, Milano, and Morris were running on an incumbent slate in the Local 707 officer election.[4] The Independent Administrator did not believe it was proper to allow persons permanently banned from the IBT to run in an IBT election. This Court affirmed the Independent Administrator's decision in a January 16, 1992 Memorandum & Order.

### B. The Rerun Election

A problem arose, however, because the Local 707 election ballots, which listed the suspended officers as candidates, had already been mailed to the membership be-

---

1. The incumbents referred to in this Opinion & Order are those who ran on the incumbent Row A Slate in the rerun election. They are: Anthony Ibelli, Nicholas Picarello, John Heephy, Alfred Gatti, Joseph Donadio, Patrick V. Breheny, and David McDermott. The term incumbents does not refer to the five officers of Local 707 permanently banished from the IBT in this Court's January 16, 1992 Memorandum & Order, three of whom were originally on the incumbent Row A Slate in the second election.

2. The background discussed in sections A and B, infra, was fully set out in this Court's December

4, 1991 order, but is repeated here for completeness.

3. News reports indicate that Grancio, a reputed member of the Colombo Organized Crime Family, was assassinated on January 7, 1992, in connection with a continuing battle between separate factions of the Colombo Family. See N.Y. Post, January 8, 1992, at 5, col. 1; N.Y. Times, January 8, 1992, at B6, col. 4.

4. Buckley was running for President, Milano for Secretary treasurer, and Morris for Recording Secretary.

fore the Independent Administrator issued his decision in Application LX. The ballots were scheduled to be counted on December 7, 1991 by the Honest Ballot Association (the "HBA"), an independent organization retained by Local 707 to conduct the election. On November 22, 1991, the IBT's General Counsel contacted the office of the Independent Administrator and reported that the IBT had received a number of inquiries regarding the impact of the Independent Administrator's decision in Application LX on the then pending Local 707 election. After consultation with the IBT's General Counsel's Office, the Independent Administrator issued a letter on November 25, 1991, which set forth a resolution of the situation. The Independent Administrator directed that: (1) the Local terminate the election process then underway; (2) a new nominations meeting be held within ten days for all Local 707 officer positions; (3) the respondents barred from the IBT in Application LX would not be eligible for nomination to any position; (4) nominated candidates seeking election to the positions to which they were originally nominated would be considered automatically nominated to those positions; and (5) nominated candidates who chose to run for a position other than the one to which they were originally nominated had to be nominated to run for such new position at the nominations meeting. Any objections to this plan had to be filed with this Court before the close of business on December 2, 1991.

The Pride Coalition filed an objection to the plan, asking this Court to vacate the Independent Administrator's plan and to order the original election to proceed to its conclusion. Neither the incumbent officers of Local 707 nor any other party filed objections. By an Order dated December 4, 1991, this Court: (1) denied the objections of the Pride Coalition to the Independent Administrator's plan; (2) ordered that the procedure set forth in the Independent Administrator's November 25, 1991 letter be followed; (3) ordered that the new nominations meeting scheduled for December 5, 1991, go forward; (4) directed the Independent Administrator to take all steps that he deemed necessary to supervise the nomina-

tion process and election; and (5) directed the Independent Administrator to inform the membership of Local 707 of the events that precipitated the cancelation of the first election.

This Court further ordered that:

Without limiting the authority of the Independent Administrator, he shall be entitled: (1) to attend the nominations meeting or have one or more representatives attend in his place; (2) to make, or have his representatives make, whatever announcements he deems appropriate at the nominations meeting; (3) to distribute an informative notice to the Local 707 members along with the new ballots that will be distributed to them; and (4) to direct the IBT to take all necessary steps to assist him in performing his duties as defined in (1)–(3), *supra,* including, but not limited to, the appointment of an International Representative to monitor Local 707 pending the completion of the election.

(December 4, 1991 Order at 5). In addition, this Court ordered that the ballots were to be received by the HBA no later than 9:00 a.m. on Wednesday, January 8, 1992, and tallied at 10:00 a.m. on January 8, 1992, at the offices of the HBA. *Id.*

As ordered, the new nominations meeting took place on December 5, 1991. Two representatives of the Independent Administrator's office attended the meeting, as did Joseph Konowe, the IBT International Representative assigned to the matter by General President McCarthy. The Row A Slate nominated new candidates. The Pride Coalition Slate remained intact as provided for in this Court's December 4, 1991 order. Along with the new ballots, the Independent Administrator enclosed a notice, in both English and Spanish (attached to this Opinion & Order as Exhibit A), to members of Local 707 explaining why the election had to be rerun. At a meeting held at the offices of the HBA on December 12, 1991, a copy of the notice was reviewed and approved by both slates, the Executive Board's attorney, and Mr. Konowe.

Representatives of the Independent Administrator's office and Mr. Konowe attended the counting of the ballots at the HBA's offices on January 8, 1992. On that date, all members of the Pride Coalition Slate were elected and all members of the Row A Slate suffered defeat.

### C. The Incumbents Refuse to Relinquish Control

On Friday, January 10, 1992, and Saturday, January 11, 1992, Stuart Alderoty, an attorney in the Independent Administrator's office who works closely with the Independent Administrator in IBT matters, received telephone calls from Richard Gilberg and Earl R. Pfeffer, attorneys with the law firm of Cohen Weiss and Simon, who represent the Pride Coalition. Mr. Alderoty was informed that the Local 707 incumbent officers, all members of the Row A Slate, refused to relinquish control and devolve power of the Local to the newly elected Pride Coalition candidates.

On January 9, 1992, Local 707 President-elect John O'Keefe sent a letter to General President McCarthy stating that the incumbent officers of the Local refused to turn over power. General President McCarthy sent a TITAN [5] message to the Local 707 Executive Board stating that the incumbents had no basis to continue holding office; he directed that the newly elected officers be installed. The incumbent officers sent a letter dated January 10, 1992, to Mr. Bernard Adelstein, Secretary Treasurer of Teamsters Joint Council 16,[6] which made a number of objections and unsubstantiated, outrageous statements about the Independent Administrator's conduct in connection with the Local 707 election.

The incumbents' January 10, 1992 letter stated, "Independent Administrator Lacey has exceeded the scope of his lawful authority and breached his fiduciary duties to the members of the [IBT] and members of Local 707." The letter goes on to list a number of objections to the Independent Administrator's actions with respect to the election, including that: (1) he exceeded his authority and thereby interfered with and influenced the outcome of the election; (2) he breached his fiduciary duty by simultaneously representing the IBT and Yellow Freight Systems, Inc. ("Yellow Freight"); [7] (3) he acted in concert with his client, Yellow Freight, for the election of the Pride Coalition candidates; and (4) he interfered with the outcome of the election by placing an inflammatory and derogatory letter against the incumbents in the envelope containing the ballots. In addition, the incumbents sent a letter to Joint Council 16 on January 10, 1992 requesting a stay of the election.

In response to the incumbents' refusal to relinquish authority, General President McCarthy sent a second TITAN message to the incumbent President of Local 707, which stated:

> [O]nly the General President has the authority to stay or delay the installation of officers in any Local Union affiliate.... Assuming your request for a stay had been properly addressed to this office, I hereby advise you that it is denied. The practice of the International Union is that officers-elect should be installed regardless of any protest which may be pending with the Joint Council. The Joint Council is free to resolve the post-election protest in the ordinary course. However, the election is legally presumed valid in the interim and, accordingly, those elected are entitled to hold office.

### D. The HBA

Consistent with this Court's December 4, 1991 Order, Local 707 retained the HBA to

---

**5.** TITAN is the IBT's computerized internal message system.

**6.** The Investigations Officer has filed a charge against Mr. Adelstein before the Independent Administrator, charging that Mr. Adelstein with knowingly associating with members of La Cosa Nostra. The Independent Administrator has set a February 19, 1992 hearing date on this charge.

**7.** As discussed *infra,* the Independent Administrator has never represented Yellow Freight. In fact, the Independent Administrator has previously issued a ruling against Yellow Freight. *See* April 3, 1991 Opinion & Order, slip op. at 8379, 1991 WL 51065 (S.D.N.Y.1991), *rev'd on other grounds, United States v. IBT,* 948 F.2d 98 (2d Cir.1991).

conduct its election. On January 13, 1992, Mr. Alderoty spoke with Maralin Falik, the Executive Director of the HBA. Ms. Falik was the person responsible for the Local 707 election and has been in communication with the Independent Administrator's office throughout the entire election. During her January 13 telephone conversation with Mr. Alderoty, Ms. Falik indicated that the HBA would not certify the election results because: (1) it had not been paid by the Local 707; and (2) a post-election objection had been filed with the Joint Council.

### E. The Independent Administrator's Application

On January 14, 1992, the Independent Administrator filed this Application, LXVI. The Independent Administrator states that "[t]he incumbent Local 707 officers are retaining control of the Local in violation of the will of the rank-and-file as expressed in the recently completed election, the IBT's clear directives, and my mandate to supervise the election pursuant to the Court's December 4, 1991, Order." (Ind.Admin. Aff. at 14). In addition, the Independent Administrator states that objections in the incumbents' January 10, 1992, letter that pertain to the Independent Administrator are without merit. (Ind.Admin. Dec. at 8). The Independent Administrator therefore requested that this Court enter an ·order directing:

(1) That the incumbent officers of IBT Local 707 immediately relinquish control of Local 707 to the newly elected officers of that Local, and that if the incumbent officials fail to relinquish control, that they personally be held jointly and severally liable in the amount of $10,000 per day, until they comply, which sum shall be paid to the Court;

(2) That IBT Local 707 immediately remit payment to the Honest Ballot Association for services rendered in connection with the Honest Ballot Association's supervision of the Local 707 elections;

(3) That upon payment of its outstanding invoice to Local 707, the Honest Ballot Association immediately certify the accuracy of the January 8, 1992, IBT Local 707 ballot count or immediately substantiate with the Court its reasons for not doing so;

(4) That counsel for the Local 707 Executive Board, Vincent J. Beck, Esq., and James P. Hoffa, Esq., immediately substantiate, in writing, to the Court's satisfaction, or withdraw, in writing, the outrageous and libelous statements concerning the alleged breach of the undersigned's "fiduciary duty as an attorney and officer of the Court," contained in a January 10, 1992, letter signed by seven members of the incumbent Row A Slate;

(5) That each member of the incumbent Row A Slate immediately substantiate, in writing, to the Court's satisfaction, or withdraw, in writing, the outrageous and libelous statements contained in the January 10, 1992, letter executed by each and every one of them;

(6) That if Mr. Beck, Mr. Hoffa and the seven members of the incumbent Row A Slate do withdraw all of the outrageous and libelous statements contained in the January 10, 1992, letter, that they shall then, within 48 hours, cause a complete retraction and apology to the undersigned to be sent to all persons shown as copy addressees on the January 10 letter; and 24 hours thereafter to file with the Court a copy of said retraction and apology along with an affidavit that such retraction and apology had been mailed to said persons.

(Ind.Admin. Aff. at 1). On January 16, 1992, this Court was informed that Local 707 paid the HBA, and that the HBA had certified the election. Accordingly, requests number two and three are moot.

By letter to the Independent Administrator dated January 15, 1992,[8] James P. Hoffa, an attorney in Detroit who had been retained by the Local 707 Executive Board in connection with the election, stated that he did not authorize anyone to claim that the Independent Administrator breached a fiduciary duty, nor did he authorize sending internal Union charges to anyone outside the Union. Hoffa also proffered an

---

**8.** This letter has been attached to this Opinion & Order as Exhibit B.

apology by adding that he did not participate in making any outrageous statements regarding the Independent Administrator's conduct or character.

On January 16, 1992, Alfred Gatti, one of the seven incumbent officers of Local 707, submitted an affidavit on behalf of the Local 707 incumbents, which raises several objections to the Independent Administrator's Application. They argue that this Court and the Independent Administrator lacked authority to intervene in the election under the Consent Decree and the Labor Management Reporting and Disclosure Act. In addition, Gatti's affidavit states:

> The allegations as to Judge Lacey's representation of Yellow Freight Systems, Inc. were made because input received from reliable sources. Little time was available to prepare the protest to Bernard Adelstein, as representative of the Joint Council. A decision was made to rely upon the information then available.

> To the extent Judge Lacey did not provide such representation, we do regret making this allegation. At the time, it did appear this statement was supported by credible evidence.

(Gatti Aff. at 7). On January 17, 1992, this Court received a further submission signed by the seven incumbent officers of Local 707 stating that "Our information concerning Independent Administrator Lacey's law firm representing Yellow Freight Systems, Inc., which we believed to be accurate, was in fact, incorrect."

## II. DISCUSSION

### A. *Failure to Relinquish Control of the Local*

■ Article XXII, § 4(c) of the IBT Constitution provides "[t]he officers-elect [in a Local Union election] shall take office at the end of the term of the incumbent officers, regardless of the date of installation." Indeed, as General President McCarthy stated in his second TITAN message to the incumbent officers of Local 707, "the practice of the International Union is that offi-cers-elect should be installed regardless of any protest which may be pending with the Joint Council.... [T]he election is legally presumed valid in the interim and, accordingly, those elected are entitled to hold office." Ironically, the incumbents cite the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 401 *et seq.*, as a basis for the failure to relinquish control of Local 707. The LMRDA provides that a "challenged election shall be presumed valid pending a final decision thereon ... and in the interim the affairs of the organization shall be conducted by the officers elected or in such other manner as its constitution and bylaws may provide." 29 U.S.C. § 482(b). Accordingly, as the Independent Administrator stated, and as mandated by the IBT Constitution, the direction of the IBT's General President, and labor law, the newly elected officers of Local 707 were entitled to take office at the moment the vote count revealed that they had won the election.

It is time for the seven incumbent officers of Local 707, Mr. Beck, and Mr. Hoffa to realize that Local 707 is not their personal fief. Put colloquially, the incumbents are not children and Local 707 is not a "ball" that they can take home when they do not like how others are playing. Holding union office is a serious responsibility; part of this responsibility is ensuring the orderly and lawful transfer of power. By refusing to leave office, the incumbents have violated the IBT Constitution, which they swore to uphold,[9] and have defied the wishes of the Local Union's membership as expressed in the election ousting them from office. Accordingly, the incumbent officers of Local 707 are ordered to relinquish control of the Local Union immediately—no later that 5:30 p.m. January 17, 1992.

### B. *The Power and Jurisdiction to Order a Rerun Election*

The incumbents contend that the Independent Administrator, and this Court, lack jurisdiction to set aside the ballots from the

---

**9.** *See* IBT Constitution, Article II, § 2(a) ("Each person becoming a member [of the IBT] thereby pledges ... to faithfully observe the Constitution and laws of the [IBT]").

first Local 707 election and then to conduct a new election. They assert that the Consent Decree did not vest the Independent Administrator or this Court with such power and that "[o]nly the Secretary [of Labor] had a right to intervene" in the election process under the LMRDA. (Gatti Aff. at 4).

### 1. Power To Order A Rerun Election

■ The Consent Decree gives the Independent Administrator the same rights and powers as the IBT General President to discharge duties that relate to disciplining corrupt or dishonest officers, and instituting trusteeships. Consent Decree, ¶ F.12.(A). The IBT General President has the power "to render judgment in accordance with the facts and circumstances presented to him" when disciplinary charges against Local Union officers "involve or relate to a situation imminently dangerous to the welfare of a Local Union." IBT Constitution, XIX, § 10(a); *see* IBT Constitution, XIX, § 9(a). The IBT Constitution's disciplinary provisions are broad and comfortably permit ordering a rerun election when contemporaneous disciplinary actions would otherwise deprive the membership of a meaningful choice of candidates.

Moreover, in order to "restor[e] democratic procedures" to Local 707, the Independent Administrator could have placed the Local in temporary trusteeship. *See* IBT Constitution, Article VI, Section 5(a); Consent Decree, ¶ F.12.(A) at pp. 8–9. Surely, in order to achieve the same objective, the Independent Administrator had the power to take the less drastic measure of requiring a new election. Indeed, this Court noted as much in its December 4, 1991 order, which provided that "[t]he Court and the Independent Administrator are empowered by the Consent Decree to take all steps reasonably necessary to ensure a meaningful vote by the membership

of Local 707 in the wake of the Independent Administrator's disciplinary authority." [10]

It is interesting to note that the incumbents did not object to the Independent Administrator's plan when it was presented to the Court, "and in fact enthusiastically participated in the renomination process and campaigned vigorously." (Ind.Admin. Dec. at 8). Having made a strategic decision to support a new election, obviously expecting a more favorable result than in the first one, the incumbents sudden challenge to this Court's authority to order a new election must be seen for what it is: a desperate attempt to retain power.

### 2. Jurisdiction To Order A Rerun Election

■ The incumbents also challenge the jurisdiction of this Court and the Independent Administrator to order a new election. They assert that challenges to the Local 707 election are governed by the LMRDA, which provides that "[t]he remedy provided by this title [29 U.S.C. § 481 et seq.] for challenging an election already conducted shall be exclusive." *See* 29 U.S.C. § 483. The remedy referred to in section 483 requires that a person or entity challenging a completed election exhaust internal Union remedies before filing a complaint with the Secretary of Labor. *See* 29 U.S.C. § 482. The incumbents contend that since this is an exclusive remedy, only Joint Council 16, as an internal Union grievance committee, and the Secretary of Labor may issue rulings affecting the Local 707 election. Therefore, they aver that this Court has no right to intervene in the election process.

Section 483 was enacted to prevent union members from filing private lawsuits to set aside union elections. *See Trbovich v. United Mine Workers*, 404 U.S. 528, 531–32, 92 S.Ct. 630, 632–33, 30 L.Ed.2d 686 (1972); *Calhoon v. Harvey*, 379 U.S. 134, 140, 85 S.Ct. 292, 296, 13 L.Ed.2d 190

**10.** Consistent with this Court's December 4, 1991 Order, the Independent Administrator forwarded an explanatory notice along with the ballots to the members of Local 707. While the incumbents argue that this notice prejudiced their chances of winning the election, the notice

explained the need for a new election. The notice is simple, direct, and truthful. *See* Exhibit A. Furthermore, the incumbents and Mr. Beck reviewed the notice before it was sent and raised no objection to its content or form.

(1964). Section 482's exclusive remedy for post-election violations, a complaint before a Union panel and then the Secretary of Labor, was intended to remedy violations of the LMRDA, to protect unions from frivolous litigation and to centralize in one proceeding all litigation relating to a single election. *See Trbovich,* 404 U.S. at 532, 92 S.Ct. at 633. These concerns are not implicated here. This Court, by exercising jurisdiction under the Consent Decree and its authority under the All Writs Act, ensured that it alone would address any challenges to or complaints about the Local 707 election. Furthermore, the second Local 707 election was run not to remedy violations of federal labor law, but to enforce internal union disciplinary rules and to ensure that the IBT membership had a meaningful electoral choice. In addition, the Second Circuit has held that even where a federal labor statute vests some entity, such as the National Labor Relations Board or the Secretary of Labor, with exclusive jurisdiction in a typical case, these statutes do not preclude this Court from adjudicating matters relating to the Consent Decree in this case. *United States v. IBT,* 948 F.2d 98 (2d Cir.1991).

The incumbents' argument, which not only lacks merit, is also duplicitous. As previously noted, the incumbents have referred to section 482's exclusive mechanism for resolving disputes concerning completed elections. The incumbents have failed to note, however, that section 482 also compels them to relinquish control of Local 707 pending review of their application. *See supra* at 248. Section 482 provides that a "challenged election shall be presumed valid pending a final decision thereon ... and in the interim the affairs of the organization shall be conducted by the officers elected or in such other manner as its constitution and bylaws may provide." 29 U.S.C. § 482(b). While respondents have cited the portion of section 482 that is allegedly favorable to their jurisdictional argument, they fail to acknowledge the portion of this same section that undermines every action they have taken thus far in refusing to abide by the election results.[11]

## C. Statements Concerning the Conduct of the Independent Administrator

■ The incumbents, in objecting to the second Local 707 election in their January 10, 1992 letter, make several comments regarding the Independent Administrator's connection with Yellow Freight, which they have since retracted. These outrageous and unfounded comments are as follows:

[The Independent Administrator] breached his fiduciary duty, as an attorney and officer of the court, by simultaneously representing the International Brotherhood of Teamsters and Yellow Freight Systems, Inc. This is a clear conflict of interest in violation of the legal professions' cannons of ethics.

[The Independent Administrator] acted in concert with his client, Yellow Freight Systems, Inc., for the election of Row B candidates. Yellow Freight Systems, Inc. did financially assist the Row B candidates in violation of 29 U.S.C. 186 (302 Taft Hartley) by providing things of value for their election.

The Independent Administrator has never represented Yellow Freight or the IBT. (Ind.Admin. Aff. at 9). This fact was confirmed by a computerized conflicts check at the Independent Administrator's law firm, and by Yellow Freight itself. (Ind.Admin. Aff. at 9). Ironically, the Independent Administrator has previously issued a ruling against Yellow Freight. *See* April 3, 1991 Opinion & Order, slip op., 1991 WL 51065 (S.D.N.Y.1991), *rev'd on other grounds, United States v. IBT,* 948 F.2d 98 (2d Cir. 1991).

As is evidenced by the names to whom the January 10, 1992 letter was copied, the statements contained in the letter were clearly designed to harm the good name and reputation of the Independent Administrator. The letter copied:

---

**11.** This decision attempts to address every remotely significant argument made by the incumbents. Nevertheless, to the extent that this decision does not specifically address every assertion made, it should be noted that this Court has considered all such arguments and finds them meritless.

Attorney General of the United States, William Barr
Chairman, Senate Judiciary Committee
Chairman, House Judiciary Committee
American Bar Association
United States Department of Justice, Office of
Professional Responsibility
Secretary of Labor
Jack O'Keefe
All Interested News Media

The incumbents never specified the organizations included in "All Interested New Media." It is also apparent that Beck and Hoffa, attorneys for the incumbents, knew that these allegations would be distributed and yet allowed publication without ascertaining their veracity.[12]

The Independent Administrator, Honorable Frederick B. Lacey, is a former United States District Judge for the District of New Jersey. He is a distinguished jurist and practitioner with an unblemished reputation for fairness and integrity. His record of service in public office, this case, and this individual matter, should make him immune from the type of outrageous and irresponsible statements contained in the incumbents' January 10, 1992 letter. Unfortunately, the incumbents still felt compelled to hurl baseless attacks at Judge Lacey's conduct.

Hoffa's proffered retraction, attached as Exhibit B, only demonstrates how irresponsible and thoughtless he was to allow the incumbents to send their January 19, 1992 letter with these statements in the first place. Nevertheless, at least Hoffa attempted to apologize for the outrageous statements concerning Judge Lacey's character. The incumbents have shown no such contrition. In the Gatti affidavit, which purports to represent the entire incumbent slate, the incumbents cling to the possibility that their comments are true, stating that "[t]o the extent Judge Lacey

did not provide such representation [to Yellow Freight], we do regret" our allegations. Having admitted the possibility of error, they did not accept responsibility, but sought to excuse their remarks by taking refuge in what they allege was information from "reliable sources" and shortness of time to file objections. The excuses that form the basis of a conditioned apology are woefully inadequate as a retraction. Furthermore, their letter, received by this Court on January 17, 1992, in which they withdraw the statements concerning Judge Lacey's conduct, contains no apology to Judge Lacey, expresses no regret for the attack on Judge Lacey's reputation, and does not even copy Judge Lacey. It is an unapologetic retraction offered through "clenched teeth." Finally, Beck has not even proffered a retraction or apology.

## III.  CONCLUSION

The IBT recently conducted its first ever rank-and-file election of International officers. In the wake of this election, the attempt by the incumbent officers of Local 707 to retain power of the Local is an affront to the rank-and-file of the Local Union they purport to represent and an embarrassment to the entire IBT. Accordingly, this Court issues the following orders:

IT IS HEREBY ORDERED that the incumbent officers of IBT Local 707 relinquish control of Local 707 to the newly elected officers of that Local immediately, and no later than January 17, 1992 at 5:30 p.m.; and

IT IS FURTHER ORDERED that within two business days of the filing of this Opinion & Order (no later than Wednesday, January 22, 1992), the Row A Slate shall provide this Court and the Independent Administrator with an affidavit that lists the "All Interested News Media" to whom the

---

12. On January 13, 1992, at approximately 3:00 p.m., the Independent Administrator spoke with Beck and inquired as to the basis of these allegations. Beck indicated that he relied on a computerized "Lexis" search. Later that same day, the Independent Administrator spoke with Hoffa. He told the Independent Administrator that

he was not sure where the Row A Slate got its information, but "they got their information." (Ind.Admin. Aff. at 10). The Independent Administrator conducted his own "Lexis" search, which revealed nothing to indicate that the Independent Administrator or his firm had ever represented Yellow Freight.

January 10, 1992 letter was faxed and/or mailed, and that also lists anyone else who was not copied on the January 10, 1992, letter, but to whom the January 10, 1992 letter was faxed and/or sent; and

IT IS FURTHER ORDERED that counsel for the Local 707 Executive Board, Vincent J. Beck, Esq., James P. Hoffa, Esq., and each member of the incumbent Row A Slate, substantiate or withdraw, in an affidavit in writing, within two business days of the filing of this Opinion & Order (no later than Wednesday, January 22, 1992), to the Court's satisfaction, the outrageous statements concerning Judge Lacey, including Judge Lacey's alleged breach of "fiduciary duty as an attorney and officer of the Court," contained in the January 10, 1992 letter signed by seven members of the incumbent Row A Slate; and

IT IS FURTHER ORDERED that if Mr. Beck, Mr. Hoffa and the seven members of the incumbent Row A Slate do withdraw all of the outrageous statements concerning Judge Lacey contained in the January 10, 1992, letter, that they shall then, by a written affidavit, within two business days of the filing of this Opinion & Order (no later than Wednesday, January 22, 1992), cause a complete retraction and apology to Judge Lacey to be sent to all persons and organizations either copied in the January 10, 1992 letter or listed in the affidavit above as having been sent a copy of the January 10 letter; and

IT IS FURTHER ORDERED that within 24 hours after sending such a retraction and apology to the appropriate persons, Mr. Hoffa, Mr. Beck and the seven members of the incumbent Row A Slate shall file with the Court a copy of said retraction and apology along with an affidavit that such retraction and apology has been mailed to said persons as ordered.

SO ORDERED.

# EXHIBIT A

OFFICE OF THE INDEPENDENT ADMINISTRATOR
c/o LeBOEUF, LAMB, LEIBY & MacRAE
Gateway Center I, Suite 603
Newark, NJ 07102-5311
(201) 643-8000
Fax (201) 622-6693

Frederick B. Lacey
Independent Administrator

**IMPORTANT NOTICE FROM**

**THE INDEPENDENT ADMINISTRATOR**

You may be wondering why you are receiving a second ballot in the 1991 Local 707 officer elections. I hope that this notice will clear up your confusion.

On November 18, 1991, I issued a decision permanently barring James Buckley, Dominick Milano and David Morris from the IBT because they knowingly associated with a member of organized crime. My decision issued after the ballots had already been sent to you listing Buckley, Milano and Morris as candidates. Recognizing that Buckley, Milano and Morris had no place in the IBT, or on the Local 707 Executive Board, I ordered that these three men should immediately be banished from the Union. My decision vacated three spots on the incumbent slate, and as a result, many members expressed concern as to the impact this would have on the election.

To resolve any uncertainty, and to insure a fair election at Local 707, I directed Local 707 to terminate its election, to hold a new nominations meeting, and to rerun the election. On December 4, 1991, the Honorable David N. Edelstein, the United States District Judge overseeing the Consent Decree, affirmed my decision. Judge Edelstein also gave me the authority to supervise the new election and to distribute this notice to you.

The new nominations meeting was held on December 5, 1991. The three permanently banished members, Buckley, Milano and Morris, were not eligible for nomination. The ballots that you are now receiving contain the names of the individuals nominated at that meeting.

**IF YOU WANT TO CAST YOUR VOTE IN THIS ELECTION, YOU MUST MARK AND RETURN THIS NEW BALLOT.** The new ballot is a grey ballot and it is the only official ballot. The old orange ballots will not be counted. The new ballots must be received by the Honest Ballot Association no later than 9:00 a.m. on Wednesday, January 8, 1992. The tally of the ballots will take place at 10:00 a.m. on January 8, 1992, at the offices of the Honest Ballot Association.

Frederick B. Lacey
Independent Administrator

**254**

OFFICE OF THE INDEPENDENT ADMINISTRATOR
c/o LeBOEUF, LAMB, LEIBY & MacRAE
Gateway Center I, Suite 603
Newark, NJ 07102-5311
(201) 643-8000
Fax (201) 622-6693

rederick B. Lacey
ndependent Administrator

**NOTICIA IMPORTANTE DEL**

**ADMINISTRADOR INDEPENDIENTE**

Usted se estará preguntando porque ha recibido una segunda papeleta para votar en las elecciones oficiales de 1991 del Local 707. Espero que esta noticia aclare todas sus dudas.

En 18 de Noviembre de 1991, yo tomé una decision, sacar a James Buckley, Dominick Milano y David Morris permanentemente de la IBT porque ellos con malícia se asociaron con un miembro de la Organizacion del crimen. Mi decision fue hecha despues de haberle mandado las papeletas nombrando a Buckley, Milano y Morris como candidatos. Reconociendo que ellos três hombres deben ser inmediatamente eliminados de esta Union. Mi decision dejó três sitios vacantes obligatorios en la lista de candidatos, por esta razon muchos miembros expresaron su miedo sobre el impacto que esto podia causar en la eleccion.

Para resolver cualquier problema y para realizar una eleccion justa en el Local 707, yo decidi que el Local 707 terminará su eleccion, para escojer nuevos candidatos en una reunion y hacer una nueva eleccion. En 4 de Diciembre de 1991, el Honorable David N. Edelstein, el Juez del Distrito de Estatos Unidos, viendo todo lo que habia sucedido afirmó mi decision. El Juez Edelstein tambien me dió la autoridad para supervisar la nueva eleccion y distribuirle a Usted esta noticia.

La reunion para las nuevas elecciones fue hecha el 5 de Diciembre de 1991. Los três miembros eliminados, Buckley, Milano y Morris no fueron elejidos para el nombramiento. La papeleta que Usted está recibiendo contiene los nombres de las personas elejidas en la reunion.

**SI USTED QUIERE VOTAR EN ESTA ELECCION, USTED DEBE MARCAR Y REGRESAR ESTA NUEVA PAPELETA.** La nueva papeleta es de color gris y es la papeleta oficial. La otra papeleta color naranja no contará. **La nueva papeleta tiene que ser recibida en la Asociacion de Votaciones Honestas a mas tardar el Miercoles, 8 de Enero de 1992, a las 9:00 A.M.** La eleccion de votos será tomada a las 10:00 A.M. el 8 de Enero de 1992, en las oficinas de la Asociacion de Votaciones Honestas.

Frederick B. Lacey
Administrador Independiente

## EXHIBIT B

LAW OFFICES
JAMES P. HOFFA, P.C.

RECEIVED

8325 EAST JEFFERSON AVENUE
DETROIT, MICHIGAN 48214-2798
In Historic Indian Village

JAMES P. HOFFA, P.C.
WAYNE A. RUDELL
KEVIN O'NEILL

JAN 15 1992

CHAMBERS OF
January 15, 1992

TELEPHONE (313) 331-8700
FAX (313) 331-8808

Mr. Frederick B. Lacey
Office of the Independent Administrator
c/o LeBoeuf, Lamb, Leiby & MacRae          VIA TELEFAX 201-622-6693
Gateway Center I, Suite 603
Newark, New Jersey  17102-5311

          Re:  Application LXVI

Dear Judge Lacey:

     I am in receipt of the Application LXVI. As I originally informed you, please be advised that the charges filed which attack your integrity as an attorney were filed without my knowledge or approval.  At no time did I ever authorize or direct anyone to claim that you were involved in any way in any alleged breach of fiduciary duty as an attorney or officer of the Court.

     You should also be advised that at no time did I ever authorize or have knowledge that anyone intended to send any internal Union charges filed by the Local Union to any individuals outside the Union, like the Attorney General, etc.

     You should be advised that I hold you in the highest rega. and have not in any way participated in making any outrageous statements regarding your conduct or character.

     To the extent that I can, I would like to apologize that if anything that has been done by anybody at Local 707, without my knowledge, has caused you any embarrassment or discomfort.

                              Very truly yours,

                              James P. Hoffa

JPH/kl
cc:  Judge David N. Edelstein
     Edward T. Ferguson, III, AUSA
     James T. Grady, Esq.
     Gary Witlen, Esq.
     Richard Gilberg, Esq.
     Marilyn Falik, Honest Ballot Association
     Barry Feinstein

Joseph Konowe
Eugene Bennett
Robert Sasso
John Burke
William Nuchow
Attorney General United States, William Barr
Chairman, Senate Judiciary Committee
Chairman, House Judiciary Committee
American Bar Association
United States Department of Justice, Office of
    Professional Responsibility
Secretary of Labor
Jack O'Keefe